838 So.2d 324 (2002)
David MOODY a/k/a William David Moody, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2000-KA-01020-COA.
Court of Appeals of Mississippi.
September 10, 2002.
Rehearing Denied November 5, 2002.
Certiorari Denied February 13, 2003.
*327 Scott Joseph Schwartz, Thomas E. Schwartz, Hattiesburg, attorneys for appellant.
Office of the Attorney General by Jean Smith Vaughan, attorney for appellee.
Before MCMILLIN, C.J., LEE and BRANTLEY, JJ.
McMILLIN, C.J., for the court.
¶ 1. This is an appeal by David Moody from his conviction in the Circuit Court of Perry County on change of venue to Oktibbeha County of one count of murder in the commission of a felony and one count of accessory after the fact of murder in the commission of a felony. The appeal raises thirteen separate issues which Moody contends warrant a reversal of his convictions. Upon due consideration, this Court finds the issues presented to be without merit and we, therefore, affirm the convictions.

I.

Facts
¶ 2. Though there may be some dispute in the evidence as to the details of these crimes, the larger picture of what transpired on the evening of May 14, 1995, is essentially undisputed. David Moody, then fourteen years old, and his cousin, Kenneth Moody, discovered a young couple alone in a relatively deserted area of Perry County. The two Moodys, acting to carry out a plan to engage in sexual relations with the female half of the couple, Robbie Bond, approached the couple and Kenneth proceeded to beat and stab her male companion, William Hatcher, until he was unable to resist. Bond was also beaten and thrown into the floorboard of the truck driven by the Moodys. After throwing Hatcher's body into the back of the truck, the Moodys transported the couple to Kenneth Moody's trailer where they dug a deep pit to dispose of Hatcher's apparently lifeless body. Kenneth then proceeded to accomplish his original purpose by raping Bond. According to the State, David Moody also raped Bond at that time; however, David Moody testified that he was being coerced by his cousin at that point and that he merely simulated the act of sexual intercourse in order to satisfy his cousin's demands. To some extent, this claim is corroborated by the fact that DNA testing on bodily fluids recovered from the body of Bond excluded David Moody as the donor of any fluid samples recovered.
¶ 3. In all events, the cousins subsequently bound Bond and, leaving her at the trailer, returned to the scene of the original abduction and attempted to destroy any evidence of what had transpired. After returning to Kenneth Moody's trailer, the Moodys forced a running water hose down the young woman's throat in a ghastly attempt to kill her by drowning. *328 This attempt was apparently unsuccessful, since there was testimony that Kenneth Moody proceeded to violently strike Bond in the head with some object before throwing her into the same pit holding the body of her companion, William Hatcher.
¶ 4. David Moody, in his defense, does not dispute the essential facts of what transpired during the commission of the crimes. Rather, his defense consisted chiefly of the assertion that his participation was coerced by threats from his cousin that, if he refused to go along, he would meet the same dismal fate as the young couple.
¶ 5. The jury, apparently unpersuaded by David Moody's claim of duress, convicted him of murder in the commission of the felony of rape in the homicide death of Robbie Bond, and of accessory after the fact of capital murder in the death of William Hatcher. It is from those two convictions that David Moody has perfected this appeal.
¶ 6. Because of the number of issues presented in the appeal, we will avoid a cumbersome recitation of each individual issue at this point by way of preliminary summary, only to repeat the issue when we turn to the discussion necessary to resolve it. Rather, we will proceed to list each issue to be immediately followed by our analysis of its merits in the same order raised by the appellant.

II.

Denial of a Speedy Trial
¶ 7. By motion filed August 3, 1999, Moody sought to have the indictment against him dismissed on the ground that he had been denied his constitutional right to a speedy trial under the Sixth Amendment. The trial court denied that motion and Moody now asserts that ruling as error before this Court.
¶ 8. No claim was made at the trial court or before this Court of a violation of Mississippi's statute relating to speedy trial requiring that the trial be accomplished within 270 days of arraignment. Miss. Code Ann. § 99-17-1(Rev.2000). Therefore, considerations arising under the statute are not now before us and we must confine our consideration to the issue of a constitutional violation. Natural Father v. United Methodist Children's Home, 418 So.2d 807, 809 (Miss.1982).
¶ 9. The length of delay based on broad constitutional concerns is measured, not from arraignment as in the State statute, but rather from the time of arrest until the time of trial. Perry v. State, 419 So.2d 194, 198 (Miss.1982). David Moody was first arrested for the crimes involved in this case on May 18, 1995, and he was subsequently tried and convicted in a jury trial that commenced on February 14, 2000. This delay of some four years and nine months substantially exceeds the presumptively prejudicial period of eight months established by the Mississippi Supreme Court in the case of Smith v. State, 550 So.2d 406, 408 (Miss.1989). The effect of this determination of presumed prejudice is that close scrutiny must be given to the various considerations regarding the impact of the delay to determine if, on balance, the difficulties raised by these considerations give rise to a reasonable determination of actual, as opposed to presumptive, prejudice. Handley v. State, 574 So.2d 671, 676 (Miss.1990). The supreme court has made it clear that the presumption of prejudice arising by substantial delays in bringing a defendant to trial is not, standing alone, enough to support a determination of an infraction of Sixth Amendment speedy trial rights of sufficient gravity to require dismissal of the charges. Adams v. State, 583 So.2d 165, 170 (Miss.1991).
*329 ¶ 10. The United States Supreme Court, in the case of Barker v. Wingo, set out four separate factors that must be considered in determining whether a defendant's right to a speedy trial under the Sixth Amendment has been violated. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Supreme Court stated that no single factor can conclusively determine the outcome of such a claim, but that the factors must be considered in conjunction for the purpose of deciding whether, on balance, it can be said that the fundamental guarantee of a prompt trial embodied in the constitution has been irretrievably denied. Id. at 533, 92 S.Ct. 2182. The Mississippi Supreme Court has repeatedly invoked the Barker analysis in considering a speedy trial claim on constitutional grounds. Flores v. State, 574 So.2d 1314 (Miss.1990); Bailey v. State, 463 So.2d 1059 (Miss.1985); Burgess v. State, 473 So.2d 432 (Miss.1985).
¶ 11. Though Moody separately raises the speedy trial provisions of the Mississippi Constitution, the case law of this State seems reasonably clear that no rights beyond those discussed in Barker arise under the Mississippi Constitution. We will make our determination of the merits of Moody's claim on the basis of the four Barker factors, which, in summary, are (a) the length of delay; (b) the reason (or reasons) for the delay; (c) whether the defendant asserted his right to a speedy trial; and (d) the existence of actual prejudice to the defendant occasioned by the length of the delay. Barker, 407 U.S. at 530, 92 S.Ct. 2182; Herring v. State, 691 So.2d 948, 955 (Miss.1997).

A.

Length of Delay
¶ 12. The delay in this case was plainly of sufficient duration to raise serious concerns regarding Moody's constitutional guarantee of a speedy trial since it substantially exceeded the benchmark of eight months established by the Mississippi Supreme Court in Smith. As we have already indicated, however, the sole effect of this determination is that the reviewing court must give close scrutiny to the remaining Barker issues to attempt to discover whether the presumptively prejudicial delay did, in fact, do harm of constitutional proportion to the defendant. Herring, 691 So.2d at 955. There are examples in case law of delays that substantially exceed the period involved in this case for which no prejudice fatal to the State's right to prosecute was found. See, e.g., De La Beckwith v. State, 707 So.2d 547 (Miss.1997).

B.

Reason for the Delay
¶ 13. The record shows that David Moody and his cousin, Kenneth Moody, were originally indicted as co-indictees for these crimes and that the prosecution had, at some fairly early point, reached a tentative plea agreement with Kenneth Moody. The plea agreement included a commitment by Kenneth Moody to appear as a witness on behalf of the State in any subsequent prosecution of David Moody. After this agreement was entered into, however, the trial court refused to accept Kenneth Moody's guilty plea offered in reliance on the terms of the plea agreement. This had the effect of calling into question the availability of Kenneth Moody to testify at the trial of David Moody and prompted an appeal to the Mississippi Supreme Court by the State seeking an adjudication that the agreement was enforceable. The case was ultimately decided in favor of the State's position in a case handed down on June 11, 1998. Moody v. State, 716 So.2d 592 (Miss.1998).
*330 ¶ 14. The bulk of the period of delay in bringing David Moody to trial was occasioned by the fact that, on March 29, 1996, the State filed a motion for continuance in David Moody's prosecution, alleging that Kenneth Moody was potentially a material witness in the case and asking that a trial date for David Moody be delayed until the availability of Kenneth Moody could be determined-a question that could not be answered until the appeal underway regarding Kenneth Moody's plea agreement was resolved. Though there is no transcript of a hearing on the State's motion, the motion states on its face that the State believed that David Moody was not opposed to the motion and the order granting the continuance recites as fact that defense counsel did not oppose the motion.
¶ 15. In this appeal, defense counsel characterizes this scenario as being an effort by the State to obtain an unfair "tactical advantage" over Moody. We cannot agree with that suggestion. It is the obligation of the prosecution to vigorously pursue the full development of the relevant facts in a criminal prosecution and it was in the fulfillment of that duty that the State sought to obtain the first-hand evidence regarding David Moody's role in the crime that could only be supplied by Kenneth Moody. That the State was temporarily thwarted in that effort by the trial judge's reluctance to give effect to the only stratagem the prosecution was able to devise to obtain Kenneth Moody's testimony cannot be attributed to any failure by the prosecution or to an attempt to manipulate the criminal justice system to David Moody's detriment. Certainly, the time from the appeal in Kenneth Moody's case until the Mississippi Supreme Court decided the matter was substantial, but, as this Court can take judicial notice, the appeal came at a time when the appellate system of the State was experiencing substantial delays brought on by an excessively crowded docket that had existed for a number of years. In that context, it simply cannot be fairly contended that the delay occasioned by the effort to obtain the eyewitness testimony of Kenneth Moody in this criminal prosecution was attributable to the State for purposes of Barker analysis.
¶ 16. Before this Court, Moody contends that the evidence in the record that he assented to the delay is unsatisfactory, intimating that he, in fact, might not have done so. An appellate court must make its determinations of what transpired in the court below based solely on the record. Martin v. McGraw, 249 Miss. 334, 346, 160 So.2d 89, 90 (1964). While a transcript of a hearing on the continuance motion might have proven enlightening and while it may have been preferable for the prosecution or the trial court to have had defense counsel affirmatively sign off on the record on the proposed delay while the appeal of Kenneth Moody's plea agreement was being resolved, the fact remains that both the motion and the trial court's order both of which were contemporaneous entries in the official record of this prosecutionindicate acquiescence on the part of the defense. Had that not been the case and had David Moody preferred that he be speedily brought to trial, it would certainly be reasonable to assume that the defense attorneys, in diligent pursuit of their duty, would have promptly and aggressively pointed out the erroneous assumptions of both the prosecution and trial court. In the absence of such evidence, we think it appropriate to treat the delay during the appeal as being consented to by the defense and thus not contributing to a showing of prejudice to the defendant.
¶ 17. The other delay of some duration was occasioned by the fact that two of David Moody's original defense attorneys *331 had subsequently gone to work as assistant prosecutors for the district attorney, giving rise to the necessity of both (a) appointing substitute defense counsel, and (b) appointing a special prosecutor after the district attorney concluded that the presence of both former defense attorneys in his office required that his office not conduct the prosecution. While the delays caused by such difficulties in the conduct of the prosecution are regrettable, they are the sort of things that inevitably arise and there is no evidence that the necessary transitions were unduly delayed without justification. We do not conclude that these delays must be counted against the State in weighing whether the State, either purposely or through inexcusable procrastination, delayed bringing its prosecution of David Moody to trial.

C.

Assertion of Speedy Trial Claim
¶ 18. David Moody points out that, at some point, he filed a proceeding in federal district court seeking discharge from confinement and dismissal of the criminal charges pending against him. He claims this fact as being an assertion of his right to a speedy trial. We interpret the consideration of a speedy trial demand as set out in Barker as being a demand filed in the prosecution itself. No such demand was ever filed. To the contrary, as we have already discussed above, insofar as the record in this case demonstrates, Moody was agreeable to delay his trial until the matter of the availability of Kenneth Moody as a witness was resolved by the Mississippi Supreme Court.
¶ 19. Somewhat late in the proceeding, on August 3, 1999, Moody did file a motion to dismiss for failure to grant a speedy trial. The Mississippi Supreme Court has plainly held that there is a fundamental difference between a prompt demand for a speedy trial and the circumstance where the defendant sits silently until he concludes that a speedy trial violation may have occurred and seeks to be discharged without trial based on that perceived violation. Perry v. State, 637 So.2d 871, 875 (Miss.1994).
¶ 20. As has been pointed out, it is not the defendant's duty to force the State to proceed with its prosecution. Id. Nevertheless, case law has also recognized that a defendant honestly desiring a speedy trial can reasonably be expected to do something to accomplish that aim. On this record, Moody's claim of a Sixth Amendment violation has not been bolstered by evidence that he ever actively pursued a more timely trial than he ultimately received. This factor must be weighed against Moody in determining the speedy trial issue.

D.

Actual Prejudice Arising from the Delay
¶ 21. Moody was incarcerated throughout the time from the original bringing of charges until the date of his trial. The fact of pre-trial confinement during any periods of delay is evidence of actual prejudice to the defendant. Barker, 407 U.S. at 534, 92 S.Ct. 2182. This factor tends to weigh against the State since the period of confinement in this trial was, by any measure, substantial.
¶ 22. Despite this, however, the fact remains that Moody had to be aware throughout the entire lengthy period necessary to resolve the appeal of Kenneth Moody's proposed plea agreement that the record indicated that he had consented to a delay in his trial. As to all other matters causing delay, there is every indication that the State proceeded with reasonable dispatch to work out those matters and get *332 the case into a triable posture. We decline to sanction a situation where the defendant sits silently and without objection through a lengthy appellate proceeding, the outcome of which has the potential to directly affect that nature of the case presented against him, then belatedly seeks to avoid ever having to face the charges brought against him because of the length of time it ultimately took to resolve the appeal.
¶ 23. Another factor in assessing actual prejudice is the unavailability of witnesses arising out of the length of the delay in bringing a matter to trial. Taylor v. State, 672 So.2d 1246, 1261 (Miss.1996). Moody attempts to show prejudice in this regard by pointing out that his father died after his arrest but before he was brought to trial. However, Moody cites to nothing that his father could have testified about regarding his innocence of the criminal charges. Apparently, Moody's father was a prospective witness in the nature of a character witness in the penalty phase of this capital murder prosecution.
¶ 24. However, since Moody did not receive the death penalty, the unavailability of his father to testify in an attempt to avoid the death penalty is moot. Without a proffer of what probative information Moody's father may have possessed regarding Moody's guilt or innocence of the charges themselves, we cannot speculate as to what this potential witness might have been able to say of benefit to the defense.

E.

Balancing the Factors
¶ 25. Performing the required balancing of all of the factors regarding a Sixth Amendment speedy trial claim, we do not conclude that Moody has made the necessary showing that the State deprived him of a speedy trial under circumstances that would require this Court to set aside his convictions and discharge him from confinement.

III.

Suppression of Statement
¶ 26. The record shows that, on May 18, 1995, Moody, in the company of his aunt and half-brother, approached Sheriff Billy McGee in an agitated state and indicated that he wished to talk. The sheriff testified that, because of Moody's emotional condition, he first concluded that he might have been the victim of some crime and was attempting to report that fact. It was only after the conversation began that the sheriff began to understand that Moody was relating to him facts regarding the recent double homicide in terms that indicated he was present when the crimes were committed. There is nothing in the record to indicate that Moody, at that time, directly implicated himself in the crime or that he was confined or detained against his will in any way by the sheriff.
¶ 27. After realizing that Moody seemed to have information relating to the murders, the sheriff transported him to a meeting with a detective named Danny Rigel, who was investigating the case. After it became apparent that Moody's story could implicate him in the crime, Detective Rigel gave Moody his Miranda warnings and obtained a videotaped statement from him.
¶ 28. At a subsequent suppression hearing, the trial court concluded that the statement was, in fact, given freely and voluntarily after Moody had been fully apprized of the various constitutional rights afforded him in that situationa required recitation that must be given to a detained suspect and which has come to be widely known as the suspect's Miranda rights.
*333 ¶ 29. In this appeal, Moody offers two alternative arguments as to why the trial court erred in not suppressing his statement in response to his motion to suppress.
¶ 30. Firstly, he claims that because of his age and his agitated emotional condition, he was incapable on that day of making the sort of informed decision to waive his constitutional right against self-incrimination that the law requires. The voluntariness of a confession is a question of fact for determination by the trial court. McGowan v. State, 706 So.2d 231 (¶¶ 21-22) (Miss.1997). The State, as the proponent of the evidence, has the burden of showing that the statement was freely and voluntarily given by a suspect fully informed of his right not to do so. Spann v. State, 771 So.2d 883 (¶ 49) (Miss.2000).
¶ 31. Sitting as fact-finder on the matter, the trial court's conclusions regarding the credibility of witnesses are entitled to deference on appeal, since the trial court hears the evidence directly and is best positioned to effectively gauge what weight and worth to afford potentially competing versions of the same events. Id. at (¶ 48). In this instance, the court heard the testimony of the investigating officers that they fully informed Moody of his rights, that he indicated that he understood those rights, that he appeared in fact to have understood them, and that he voluntarily elected to waive those rights and offer his statement. The court found that evidence believable and we have no basis on this record to conclude that this determination was in error.
¶ 32. Certainly, the fact that Moody was only fourteen years of age is a proper element for the court to consider in assessing the informed nature of the waiver of rights. Clemons v. State, 733 So.2d 266 (¶ 11) (Miss.1999). However, age alone is not conclusive of the question. In this case, it must be remembered that the defendant, of his own volition, came to law enforcement officers to discuss the matter of the murders. Whether prompted to do so by matters of conscience or other factors known only to Moody, it is evident that he had given advance thought to the fact of reporting his close involvement in the crimes. Though originally quite agitated, the officers reported that Moody became less emotional and appeared rational when discussing the matter of waiving his Miranda rights. The court further had the benefit of the videotape in assessing the voluntary nature of Moody's statement. Based on the totality of the evidence, we are unable to conclude that the trial court erred in determining that the State had met its burden to defeat Moody's claim that his statement was inadmissible based on a violation by the State of his right against self-incrimination afforded him under the constitution.
¶ 33. Secondly, Moody claims that his statement should be suppressed because it was obtained without the presence of a parent and without representation by counsel, all in violation of provisions of the Mississippi Youth Court Act. Crimes of the nature brought in this proceeding are within the exclusive jurisdiction of the circuit court from their inception, rendering the provisions of the Youth Court Act inapplicable. Miss.Code Ann. § 43-21-151(1)(a) (Rev.2000); Winters v. State, 473 So.2d 452, 459 (Miss.1985). The Winters decision made clear that the complete inapplicability of the Youth Court Act's provisions extended to questions regarding the admissibility of pre-trial statements made by youthful offenders. Id. at 456.
¶ 34. Moody attempts to distinguish Winters and invoke the protection of the Youth Court Act in this case by pointing out that he had not been formally charged *334 with these crimes at the time he offered his statement. We decline to put that fine a point on the Winters decision. Once a minor becomes a suspect in a crime carrying a potential life sentence or death to the extent that it becomes necessary to detain that person and inform him of his Miranda rights prior to an attempt to interrogate him, we conclude that Section 43-21-151(1)(a) is sufficiently invoked so as to remove that youthful suspect from the protections otherwise afforded him under the Youth Court Act.

IV.

Failure to Sever the Counts
¶ 35. Moody sought to sever the two murder counts for which he was indicted in a single multi-count indictment and to be tried separately on each charge. The trial court refused and Moody raises that as error on appeal.
¶ 36. Section 99-7-2 of the Mississippi Code specifically permits multiple counts in a single indictment where the offenses are based on the same transaction or consist of two or more offenses connected together or part of a common scheme or plan. Miss.Code Ann. § 99-7-2 (Rev. 2000). It is difficult to envision two crimes more hopelessly intertwined than these two tragic murders. This issue is plainly without merit.

V.

Failure to Transfer this Case to Youth Court
¶ 37. Moody sought to have his case transferred to Youth Court under Section 43-21-159(4) of the Mississippi Code. That statute permits the circuit court having original jurisdiction of a youthful offender to nevertheless transfer the matter to the appropriate Youth Court upon a finding that it is in the defendant's best interest and the best interest of justice. Miss.Code Ann. § 43-21-159(4) (Rev.2000).
¶ 38. Moody sought such transfer by motion, but never obtained a definitive ruling from the trial court on the motion. He now asserts that we should remand for a hearing on the motion. It is the obligation of the movant to diligently pursue any motion to final ruling by the trial court. George County v. Davis, 721 So.2d 1101(¶ 14) (Miss.1998) (citing Uniform Rules of Circuit and County Court Rule 2.04). It is a fundamental principle of appellate practice that any motion made at the trial level not ruled upon prior to the conclusion of the proceeding before the trial court is deemed waived. Snider v. State, 755 So.2d 507(¶ 7) (Miss.Ct.App. 1999) (citing Hemmingway v. State, 483 So.2d 1335, 1337 (Miss.1986)). That principle applies in this case and we decline Moody's belated request for a remand for a hearing on his motion.

VI.

Motion to Quash the Venire
¶ 39. During jury selection, one venire member actively voiced his distrust of all lawyers to other members of the potential jury panel. Another potential juror publicly expressed the view that people who commit violent crimes should suffer as much as their victims. Claiming these remarks were unduly inflammatory, defense counsel sought to have the venire dismissed and a mistrial declared. The trial court denied the motion and that is raised as error on appeal. The court conducted a thorough inquiry of all potential jurors seeking to determine whether they had been adversely affected in any way by these statements and received individual assurances from enough venire members to seat a jury that the statements had not affected their ability to fairly and impartially *335 decide the case based on the facts and the law. Such matters are left to the sound discretion of the trial court. Hopson v. State, 625 So.2d 395, 403 (Miss. 1993). We can see no abuse of the trial court's discretion in the commendable manner in which these potential problems were handled, permitting the case to proceed to conclusion.

VII.

Prosecutorial Misconduct in Opening and Closing Statements
¶ 40. Moody claims that the trial court should have granted a mistrial on two separate occasions based on the prosecuting attorney's (a) misuse of the State's opening statement and (b) improper and inflammatory use of closing argument.

A.

Opening Statement
¶ 41. During opening statement, the prosecutor remarked that "[n]ow, you may be wondering at this point, as I am, what can he saywhat can he say. He admitted it all." The prosecutor subsequently informed the trial court that his remarks were intended to point out that Moody had given a statement that the prosecution believed substantially implicated him in the crimes. While these remarks might reasonably be interpreted as an improper challenge to the defendant to waive his Fifth Amendment right against self-incrimination and take the stand to testify, Moody does not advance that argument.
¶ 42. Instead, Moody argues in vague terms that a prosecutor must "refrain from doing or saying anything that would tend to cause the jury to disfavor the defendant due to matters other than evidence relating to the crime." While a fairly detailed statement tending to directly implicate a person in two grisly murders would certainly have the potential to cause the jury to disfavor that person, we do not think that this evident reference to the victim's statementalready ruled admissible by the trial courtwas an improper attempt by the prosecution to curry disfavor for the defendant among the jurors. Therefore, as to the specific issue presented to us in the appeal, we find no error in the trial court's refusal to grant a mistrial based on these statements by the prosecution.

B.

Closing Argument
¶ 43. During summation, the prosecutor made certain comments that Moody claims were prejudicial concerning Moody's attempts to conceal the facts and his lack of any demonstrated remorse for his part in the crimes. No contemporaneous objections to these arguments were made. If an improper argument is being made, a contemporaneous objection permits the trial court to take such corrective action as is necessary to cure the problem and avoid the needless expense and delay of a full retrial. Johnson v. State, 477 So.2d 196, 210 (Miss.1985). It is largely for that reason that an appellate court will not consider for the first time on appeal a claim of prejudice arising during the trial that the trial court was not given the opportunity to resolve after a timely objection. Colburn v. State, 431 So.2d 1111, 1113-14 (Miss.1983). We do not find the remarks so egregious as to warrant relief on the theory of plain error affecting the fundamental fairness of the trial, electing rather to treat this issue as being procedurally barred.

VIII.

Failure of Trial Court to Quash the Indictment or Direct a Verdict of Acquittal
¶ 44. Moody claims that the indictment was fatally defective in charging *336 the underlying crime of rape, since the indictment charged the underlying crime only by the use of the word "rape," but failed to affirmatively allege that the victim was of previously chaste character, that being one of the constituent elements of rape as defined by Section 97-3-71 of the Mississippi Code. In Mackbee v. State, the defendant advanced a similar argument where the underlying crime in a capital murder prosecution was robbery. Mackbee v. State, 575 So.2d 16, 34 (1990). The indictment charged the underlying crime only as "robbery" without setting out the various elements of the crime, yet the Mississippi Supreme Court found that a capital murder indictment in this form, not challenged at the inception by a demurrer, was sufficient to inform the defendant of the nature of the charge brought against him. Id. at 35.
¶ 45. We can find no basis to distinguish Mackbee. The allegation that the murder occurred during the commission of the crime of rape against the female victim was sufficient.
¶ 46. As to the more general claim that the evidence of guilt was insufficient to sustain a guilty verdict, we resolve such claims by reviewing the evidence in the light most favorable to the prosecution. Garrett v. State, 549 So.2d 1325, 1331 (Miss.1989). In that circumstance, we are satisfied that the State presented substantial evidence that, if found credible by the jury, would easily establish the commission of each of the elements of the crimes for which David Moody stands convicted. The evidence, viewed in the light favorable to upholding the jury's verdict, would also support a reasonable inference that David Moody participated in each of the critical acts of the crimes, either by his own actions or by acting as a willing accomplice of Kenneth Moody. Though Moody had no obligation to take the stand and attempt to directly advance his argument that he only participated in the crimes out of a real fear of imminent bodily injury at the hands of his cousin, his failure to do so certainly had the effect of substantially weakening those claims that appeared only in his pre-trial statements to investigating officers. Even in his own version of events given during the statement, David Moody would seem to have had multiple opportunities to flee with relative ease from the location of these heinous crimes, yet the fact remains that he did not do so and he has yet to articulate a credible reason for that failure. The right not to testify is absolute, but the consequence of leaving deeply incriminating circumstances unexplained to the jury is an inevitable consequence of such a decision. That the jury found Moody's claims of coercion implausible on this record is not surprising.
¶ 47. As a corollary to Moody's argument that the indictment's failure to charge the previously chaste character of the rape victim rendered the indictment fatally defective, he also argues that the State's evidence was insufficient because of its failure to offer affirmative evidence on the point. Section 97-3-69 of the Mississippi Code creates a presumption of chastity and places the burden on the defendant to prove otherwise. Miss.Code Ann. § 97-3-69 (Rev.2000). Moody offered no evidence to carry the burden placed on him by the statute so that the presumption necessarily prevails on this issue.
¶ 48. The claim that the evidence was insufficient to convict, depending as it does almost exclusively on Moody's unsubstantiated claims of coercion, is without any merit.

IX.

Error in Granting Instruction S-3
¶ 49. Moody complains that S-3, giving the elements of the underlying *337 crime of rape, failed to include the requirement that the jury determine the victim's previous chaste character. In the context of this case, where there was no evidence whatsoever presented by the defense to put the victim's character for chaste behavior into issue, thereby leaving the statutory presumption of chastity to unequivocally control the issue, we find the failure to include the matter in the instruction on what constituted rape to be harmless error.

X.

Aiding and Abetting Instruction
¶ 50. Moody claims that the instruction on aiding and abetting was defective because it did not require a finding that he "wilfully" assisted in the commission of the crimes; thereby depriving him of his "coercion" defense. At trial, Moody's objection to the instruction consisted principally of a contention that it amounted to a "conspiracy" instruction, and that no criminal conspiracy had been charged in the indictment. Objections to instructions must be based on specific articulated grounds and all objections not so stated are deemed waived. Crawford v. State, 787 So.2d 1236 (¶ 35) (Miss.2001). We find this narrow objection argued on appeal to be different from that asserted before the trial court and, thus, procedurally barred.
¶ 51. In all events, we do not think the instruction, when considered in conjunction with all others, has any tendency to mislead or confuse the jury or to impermissibly lower the State's burden of proof. This issue is without merit.

XI.

Instruction on Chaste Character
¶ 52. The trial court gave an instruction regarding the statutory presumption of the previous chaste character of the victim, and Moody claims that was reversible error. Since the instruction defining the underlying crime of rape did not include any reference to the victim's character for chastity, it could be argued that this instruction could have proven confusing; however, it was not an erroneous statement of the law as Moody contends. His contention that the State had to somehow affirmatively prove the victim's chaste character in order to convict is without merit.

XII.

Failure to Give a Duress Instruction
¶ 53. The trial court refused to give Moody an instruction setting out the legal defense that acting under duress or coercion of sufficient gravity can constitute a defense to a criminal charge on the theory that a defendant acting under such compulsion does not possess the necessary criminal intent.
¶ 54. The only evidence of coercion came in Moody's taped statement to police. He did not take the stand to reveal to the jury the entire body of facts that he contended placed him in real fear of imminent bodily injury or death at the hands of his cousin, Kenneth Moody, with whom he had been voluntarily joy riding and drinking intoxicating beverages only moments before the commencement of these horrible crimes. Neither did he ever offer any credible explanation for his failure, over the prolonged period of the events of this episode, to avail himself of multiple opportunities to resist the coercive powers of his cousin or to simply flee from his presence and seek assistance. Certainly the defense of duress rises substantially above mere acts of intimidation of hyperbolic threats and there is nothing credible in *338 this record that would reasonably support such a finding by the jury.
¶ 55. The evidence to support an instruction on the defendant's theory of his defense need not be of any particular persuasive power. Ellis v. State, 778 So.2d 114 (¶ 15) (Miss.2000). Nevertheless, every instruction must find some credible support in the record in order to justify its being offered to enlighten the jury. Jones v. State, 797 So.2d 922 (¶ 16) (Miss.2001). In this case, we cannot say that the self-serving statements in Moody's police statement, unaccompanied by any corroborating evidence or by Moody's own testimony as to his state of mind and the source of his anxiety given directly to the jury, rose to the level of requiring a "duress" instruction and we decline to reverse this conviction on that basis. In doing so, we note that defense counsel was permitted to argue Moody's lack of criminal intent based on fear of harm from his cousin if he did not do his bidding, thereby adequately presenting this defense to the jury for consideration.

XIII.

Alternate Sentencing under Youth Court Act
¶ 56. Moody claims that the trial court should have considered sentencing Moody under the Youth Court Law even after he was convicted as an adult. Such discretion is afforded the trial court under Section 43-21-159(3) of the Mississippi Code. However, there is no indication in the record that Moody ever asked the court to consider such alternate form of sentencing. The maximum punishment under Section 43-21-159(3) is one year in the county jail. Even assuming the trial court had some affirmative duty to consider such alternative sentencing on the record prior to sentencing Moody to the Department of Corrections as an adult, we are satisfied beyond question that the absence of a finding by the circuit court that one year in the county jail was an inappropriate punishment for crimes of this magnitude is, to the extent that it constitutes error, entirely harmless error.

XIV.

Failure to Grant a New Trial
¶ 57. Moody asserts error in the trial court's failure to grant a new trial. His argument on this point lacks any specificity. It makes broad and largely conclusory allegations of "numerous errors committed at trial coupled with the fact that the prosecution withheld information prior to trial." It is the duty of the appellant to point to specific factual issues supporting his various claims for relief, to be accompanied by citations to the record showing where the evidence relating to such issues may be found and to citations to legal authorities, where available, to support his contentions. Misso v. Oliver, 666 So.2d 1366, 1369-70 (Miss.1996). Without such support for his arguments, an appellate court cannot adequately consider an issue raised on appeal and make an informed decision as to whether it has, or does not have, merit.
¶ 58. Finding ourselves without enough information in Moody's brief to determine whether his claim to a new trial is meritorious, we decline to consider the issue.
¶ 59. THE JUDGMENT OF THE CIRCUIT COURT OF PERRY COUNTY ON CHANGE OF VENUE TO OKTIBBEHA COUNTY OF CONVICTION OF COUNT I CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT; COUNT II ACCESSORY AFTER THE FACT TO CAPITAL MURDER AND SENTENCE OF FIVE YEARS, SAID SENTENCE TO RUN *339 CONSECUTIVELY TO SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PERRY COUNTY.
KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.